UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| MEHMET KAHVECI, P.C., d/b/a FANEUIL HALL DENTAL ASSOCIATES, ) ) ) ) | |
| Plaintiff, ) ) | Civil Action No. 18-10459-FDS |
| v. ) ) | |
| CITIZENS BANK, N.A., ) ) | |
| Defendant. ) ) | |

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO AMEND

**SAYLOR, J.**

This is an action by a customer against a bank arising from an employee's unauthorized depositing of company checks into her personal checking account. Plaintiff Mehmet Kahveci, doing business as Faneuil Hall Dental Associates, operates a dental practice in Boston, Massachusetts. His office manager, a trusted employee and friend, embezzled funds by depositing checks addressed to his practice into her own checking account at defendant Citizens Bank. The complaint contends that the bank was negligent in letting the employee deposit the checks by means of forged endorsements.

Defendant has moved for summary judgment, contending that plaintiff's claims are barred by the statute of limitations. Plaintiff has opposed the motion and moved to amend the complaint, primarily to add a claim under Mass. Gen. Laws ch. 93A. For the reasons stated below, the motion for summary judgment will be granted, and the motion to amend will be denied.

## I. Background

### A. Factual Background

Except where otherwise noted, the following facts are set forth in the record and are undisputed.

Mehmet Kahveci is a dentist who operates his practice through a professional corporation, Mehmet Kahveci, P.C., doing business as Faneuil Hall Dental Associates ("FHDA"). The dental practice is located at 177 State Street, Boston, Massachusetts. Kahveci is the practice's primary dentist, and the only officer, director, and shareholder of the professional corporation. (MK Aff. ¶¶ 1-2; VC Aff. ¶¶ 2-3).

Citizens Bank, N.A., is a national banking association, with a principal office located at 28 State Street, Boston, Massachusetts. (Compl. ¶ 2).

As part of Kahveci's practice, he accepts payments from patients directly and from health insurance companies. (Compl. ¶ 5; MK Aff. ¶¶ 10, 22; VC Aff. ¶ 12). Any checks received were supposed to be deposited in the bank account used exclusively with the operation of the business: an account at Citizens Bank titled "Faneuil Hall Dental Associates." (Compl ¶ 7; MK Aff. ¶ 3; RN Aff. ¶ 10(a), Ex. A; Kahveci Dep. at 31-32). The practice has maintained that account since at least April 2008. (Def.'s SMF ¶ 2).

In 2003, Kahveci hired Julia Vaysglus as an office assistant. (Kahveci Dep. at 24-26; MK Aff. ¶¶ 8-9; VC Aff. ¶¶ 10-11). She was recommended to him by her cousin, Kahveci's domestic partner, who works as a dental hygienist at the practice. (*Id.*). Kahveci came to consider Vaysglus both a friend and a trusted employee, and also had a friendship with her husband. (Kahveci Dep. at 34-35, 80-81). As an office assistant, she was responsible for a variety of administrative tasks, including new patient intake and onboarding, preparing and

submitting insurance claims, placing orders for dental supplies and materials, sorting the daily mail and dental supply deliveries, preparing payments due for various monthly expenses, processing and depositing payments received from patients and their insurers, and assisting with bookkeeping. (MK Aff. ¶ 10; VC Aff. ¶ 12).

Sometime in 2007, Kahveci promoted Vaysglus to the position of office manager. (Kahveci Dep. at 26-27; MK Aff. ¶ 11; VC Aff. ¶¶ 13-14). As office manager, she acquired additional responsibilities; she became the primary bookkeeper, which entailed entering and categorizing all outgoing expense payments and incoming check and credit card payments into a bookkeeping software program, and processing biweekly payroll and making the associated payroll tax payments. (Kahveci Dep. at 27, 69-70; MK Aff. ¶ 12; VC Aff. ¶ 15). She also became the employee primarily tasked with entering and monitoring all insurance claims within the software program used by the practice as its patient-file and insurance-tracking system. (MF Aff. ¶ 16; VC Aff. ¶ 16). In her new position as office manager, Vaysglus reported directly to Kahveci. (Kahveci Dep. at 28).

Sometime between December 15 and 30, 2014, Kahveci received a notice from the Internal Revenue Service stating that he had underreported his practice's gross income for the 2013 tax year by $96,633.10. (Kahveci Dep. at 37-39, 43, Ex. 3 at No. 3.3). Shortly thereafter, he contacted the practice's outside accountants to determine the cause of the discrepancy. (Kahveci Dep. at 38-41; MK Aff. ¶¶ 38-39, Exs. A-B; KS Aff. ¶ 15).[1]

On January 2, 2015, Kahveci and his accountants began their investigation (originally, with Vaysglus's assistance). As she was either unable (due to the recent birth of her child) or,

---

[1] Kahveci contends there is evidence in the record to establish that he received the IRS notice on December 30, 2014; that he immediately forwarded a copy of it by e-mail to his accountants; that he sent them the hardcopy notice by Federal Express on December 31, 2014; and that they received that hardcopy on January 2, 2015. (Pl.'s Resp. ¶ 15, citing MF Aff. ¶¶ 38-39, Exs. A-B; VC Aff. ¶¶ 19-21, Ex. A-1).

3

more likely, unwilling (due to her embezzlement) to assist, Kahveci assigned one of his other front-desk employees to help. (Kahveci Dep. at 47-49; MK Aff. ¶¶ 40-47, 55, Exs. B-C; VC Aff. ¶¶ 8, 19-27, and Exs. A-2-C). It then took several weeks to obtain the necessary Form 1099s and detailed payment information from some 55 insurance companies that had made payments to the practice in 2013. (MK Aff. ¶¶ 46-57, Exs. B-G; VC Aff. ¶¶ 24-38, Exs. A-1-I; KS Aff. ¶¶ 16-19).

On February 11 and 12, 2015, Kahveci and Vaysglus exchanged a series of texts messages about the discrepancy. (MK Aff. ¶ 62, Ex. F). During that conversation, he voiced his suspicions that the discrepancy was due to "either insurance error or embezzlement." (*Id.*).

On February 13, 2015, Kahveci received a telephone call from Vaysglus's husband. He told Kahveci that his wife had asked him to call and confess that she "had stolen money." (Kahveci Dep. at 58-59; MF Aff. ¶¶ 66-68, Exs. B-G; VC Aff. ¶¶ 39-40). He terminated Vaysglus soon thereafter. (Kahveci Dep. at 61-62; VC Aff. ¶¶ 41-44, Exs. J-K).

Over the course of the next several weeks, Kahveci, with the help of his accountants, learned the details of the embezzlement. (Compl. ¶¶ 12, 15; MK Aff. ¶¶ 69-74; VC Aff. ¶¶ 17, 39-43, 46-49, Exs. K, M-P; KS Aff. ¶ 31). The investigation was completed in March 2015. (Kahveci Dep. at 69; MK Aff. ¶¶ 72-74).

Kahveci learned that Vaysglus had taken insurance checks payable to his practice and, instead of depositing them in the practice's account, deposited them into one of her two personal accounts, also at Citizens Bank. (Compl. ¶ 15; MK Aff. ¶ 5; RN Aff. ¶ 5). He discovered that between January 2009 and December 2014, she deposited at least 281 insurance checks into her personal accounts—bringing the total amount embezzled to $352,913.28. (Compl. ¶¶ 11, 15-18; MK Aff. ¶¶ 4, 7; RN Aff. ¶¶ 4, 7). She was not, of course, authorized to deposit those checks

4

into her own accounts. (Compl. ¶ 16; MK Aff. ¶ 6; RN Aff. ¶ 6).

Vaysglus misappropriated the checks by endorsing checks payable to "Faneuil Hall Dental Associates" or "Mehmet Kahveci DMD" with the handwritten words "pay to the order of Julia Vaysglus," and then forging his signature underneath. (MK Aff. ¶ 6; RN Aff. ¶ 6). There were also at least two checks that she deposited directly into her account without any endorsement. (RN Aff. ¶ 6). Citizens Bank credited Vaysglus's accounts in the full amount of each check. (Compl. ¶ 18; MK Aff. ¶ 7; RN Aff. ¶ 7). In addition, it did not inquire as to whether Vaysglus was authorized to endorse the checks or deposit them into her own accounts. (Compl. ¶ 19).

Kahveci filed suit against Vaysglus on September 23, 2015. (Kahveci Dep. at 76). More than two years later, on February 2, 2018, he filed this complaint against Citizens Bank. (Compl.)

### B. Procedural Background

The complaint was filed in the Suffolk County Superior Court on February 1, 2018, asserting claims for conversion and negligence. Citizens Bank received a copy of the complaint on February 23, 2018. (Not. of Removal ¶ 5). It timely removed the action to this Court on March 9, 2018.

On March 21, 2018, Citizens Bank moved to dismiss the complaint, contending that all claims are time-barred. The Court denied that motion on April 23, 2018.

On May 31, 2018, the Court held a scheduling conference pursuant to Fed. R. Civ. P. 16(b). Two weeks prior to the conference, on May 17, 2018, the parties submitted a joint statement pursuant to Local Rule 16.1 proposing a pretrial schedule. The joint statement of the parties proposed a deadline for "Amended Pleadings under Fed. R. Civ. P. 15" of July 20, 2018.

The Court had a colloquy with counsel at the scheduling conference concerning the proposed deadlines. Counsel were advised in the course of the conference that the deadline for amending the pleadings to add new parties or assert new claims or defenses would be July 20, 2018. It then issued a written scheduling order that provided as follows:

> **2. Amendments to Pleadings.** Except for good cause shown, no motions seeking leave to add new parties or to amend the pleadings to assert new claims or defenses may be filed after 7/20/2018.

(Sch. Order at 1).[2]

Under the scheduling order, fact discovery closed on October 19, 2018, and dispositive motions were due by November 30, 2018.

On November 9, 2018, Citizens Bank moved for summary judgment, once again contending that all claims are time-barred.

On November 13, 2018, Kahveci moved for leave to file an amended complaint to (1) add Kahveci individually (in addition to the professional corporation) as a plaintiff; (2) add a claim under Mass. Gen. Laws ch. 93A; (3) correct certain typographical errors; and (4) reaffirm his demand for a jury trial.

## II. Motion for Summary Judgment

### A. Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

---

[2] For some reason, the written scheduling order was not docketed until August 7, 2018.

R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

    **B.**    <u>Analysis</u>

Count One asserts a claim for conversion. "In Massachusetts, 'check collection is governed by the UCC,' and, in the check collection context, 'where a UCC provision specifically defines parties' rights and remedies, it displaces analogous common-law theories of liability.'" *Union Street Corridor-Cmty. Dev. Corp. v. Santander Bank, N.A.*, 191 F. Supp. 3d 147, 150 (D. Mass. 2016) (quoting *Gossels v. Fleet Nat'l Bank*, 453 Mass. 366, 370 (2009)) (alterations omitted). Therefore, Article 3 of the Uniform Commercial Code, as codified in Mass. Gen. Laws ch. 106, governs the conversion claim. Counts Two and Three assert common-law claims for negligence.

The parties agree that all of the claims are subject to a three-year limitations period. *See* Mass. Gen. Laws ch. 106, § 3-118(g) ("an action [ ] for conversion of an instrument . . . must be commenced within three years after the cause of action accrues."); Mass. Gen. Laws ch. 260, § 2A ("Except as otherwise provided, actions of tort . . . shall be commenced only within three

7

years next after the cause of action accrues."). Once a defendant has met his burden of establishing a *prima facie* case of untimeliness, he is entitled to summary judgment, unless the plaintiff has proffered facts that take the case "outside the impact of the statute of limitations." *O'Connor v. Redstone*, 452 Mass. 537, 551 (2008); *Albrecht v. Clifford*, 436 Mass. 706, 715 (2002).

The bank has clearly met its burden of establishing a *prima facie* case of untimeliness. Vaysglus's embezzlement began in 2009 and ended in 2014. Under the most charitable reading of the factual record, the last possible date the bank could have accepted an endorsed check from Vaysglus without notifying plaintiff was December 31, 2014. If the cause of action accrued that day, the three-year limitations period expired no later than December 31, 2017. The complaint against the bank was not filed until February 1, 2018. Accordingly, unless plaintiff can establish facts that take this case "outside the impact of the statute of limitations, then [the bank] is . . . entitled to summary judgment." *See O'Connor*, 452 Mass. at 551.

Plaintiff contends that his claims are not time-barred under the discovery rule. Under that rule, a claim does not accrue as long as the underlying facts that give rise to it remain "inherently unknowable," a standard that is "no different from, and is used interchangeably with, the 'knew or should have known' standard." *Williams v. Ely*, 423 Mass. 467, 473 n.7 (1996); *see also Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 64-65 (1st Cir. 1997). The rule tolls the limitations period "until 'events occur or facts surface which would cause a reasonably prudent person to become aware that she or he had been harmed.'" *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 187 (1st Cir. 2006) (quoting *Felton v. Labor Relations Comn'n*, 33 Mass. App. Ct. 926, 927 (1992)). The plaintiff bears the burden of "demonstrating that [he] did not know of the [injury] within the statute of limitations [period] and that 'in the exercise of

8

reasonable diligence, [he] should not have known.'" *Albrecht*, 436 Mass. at 715 (quoting *Friedman v. Jablonski*, 371 Mass. 482, 487 (1976)); *see also O'Connor*, 452 Mass. at 551-54.

In the absence of actual notice of the injury, a cause of action does not accrue until a plaintiff is on inquiry notice. *Epstein*, 460 F.3d at 187. A plaintiff is on inquiry notice "when the first event occurs that would prompt a reasonable person to inquire into a possible injury at the hands of the defendant." *Id.* (citing *Szymanski v. Boston Mut. Life Ins. Co.*, 56 Mass. App. Ct. 367, 371 (2002)). Once a plaintiff has such knowledge or notice, the cause of action accrues, "even if the plaintiff does not apprehend the full extent or nature of the injury." *Zamboni v. Aladan Corp.*, 304 F. Supp. 2d 218, 224 (D. Mass. 2004) (citing *Phinney v. Morgan*, 39 Mass. App. Ct. 202, 208 (1995)); *see also Taygeta Corp. v. Varian Assocs., Inc.*, 436 Mass. 217, 229 (2002).

While the Supreme Judicial Court has cautioned that "[i]n most instances, the question when a plaintiff knew or should have known of its cause of action is one of fact that will be decided by the trier of fact," summary judgment is appropriate where, based on the record presented, "the plaintiff[ ] ha[s] failed as matter of law to sustain [his] burden that [his] action was timely." *Taygeta Corp.*, 436 Mass. at 229 (citing *Riley v. Presnell*, 409 Mass. 239, 240, 247-48 (1991)); *LePage v. Shawmut Bank, N.A.*, 49 Mass. App. Ct. 1119, n.3 (2000) (quoting *Phinney*, 39 Mass. App. Ct. at 206). "The appropriate standard to be applied when assessing knowledge or notice is that of a 'reasonable person in the plaintiff's position.'" *Taygeta Corp.*, 436 Mass. at 229 (quoting *Riley*, 409 Mass. at 245).

Here, the bank contends that at the very latest the limitations period began to run when plaintiff "received the IRS Notice in December 2014 and began to investigate the IRS statement

9

that he underreported his income in 2013 by $96,633." (Def.'s Mot. at 7 n.2).[3]

Plaintiff concedes that by December 2014 he was aware that he had underreported his practice's gross income for 2013 by nearly $100,000. He contends, however, that at that time he was unaware of, and not capable of knowing, both the cause of his injuries (the embezzlement) and the bank's contribution to those injuries (the acceptance of forged endorsements). He contends that his claims against the bank did not accrue until, at the very earliest, the date of Vaysglus's confession: February 13, 2015.[4] At a minimum, according to plaintiff, there is a dispute of material fact as to whether he conducted a reasonably diligent investigation during the six weeks between his receipt of the IRS statement and the date of that confession.

But the issue is not whether plaintiff was aware of all the facts when he received the IRS statement, or whether his investigation after he received the statement was diligent. Rather, it is whether the receipt of that statement put him on inquiry notice. And it clearly did. As soon as he received that statement, he was on notice that something was seriously wrong with the financial aspect of his practice; that it more likely than not involved the bookkeeping function; and that an investigation was necessary to determine what happened. He of course did not know at that point whether the problem was due to an accounting error, embezzlement, or something else. Nonetheless, he was on notice, and from that point forward he had three years in which to conduct an inquiry, ascertain whether he had a cause of action, and file suit if appropriate.

In fact, the receipt of the IRS statement did not just put plaintiff on notice that he had an issue that required investigating; it actually triggered an investigation. Plaintiff immediately e-

---

[3] The bank also argues that the cause of action actually accrued in 2009, when Vaysglus began her embezzlement; because plaintiff was not reasonably diligent in his supervision of her work, it contends, he cannot invoke the protections of the discovery rule. The Court expresses no view as to the merits of that claim.

[4] He further contends that it was not until March 2015 that he learned exactly how the embezzlement was accomplished, discovered the bank's role in the scheme, and saw copies of the endorsed checks.

mailed his accountants after he received the statement, and within a few days (by January 2, 2015) an investigation was underway. The crime was not complex, and the investigation bore fruit rapidly; within five or six weeks, if not earlier, plaintiff became aware of a likely embezzlement, and Vaysglus effectively confessed within days after that.[5]

It is true that Vaysglus made efforts to conceal her embezzlement between 2009 and 2014, and refused to assist the investigation in 2015. But that does not mean that the IRS statement was insufficient to trigger inquiry notice. Again, it was the notice of possible injury, not notice of the full extent of it, that triggered the running of the limitations period. *See Zamboni*, 304 F. Supp. 2d at 224.

In short, plaintiff's December 30, 2014 receipt of the IRS statement reporting a gross income discrepancy was "the first event [that] occur[ed] that would prompt a reasonable person to inquire into a possible injury at the hands of [the bank]." *See Epstein*, 460 F.3d at 187. Accordingly, plaintiff was on inquiry notice of his injuries by December 30, 2014. The three-year limitations period for conversion and negligence claims expired on December 30, 2017. Because he did not file his complaint until February 2, 2018, his claims are precluded by the three-year statute of limitations set forth in Mass. Gen. Laws ch. 106, § 3-118(g), ch. 260, § 2A. The bank's motion for summary judgment will therefore be granted.

## III. Motion to Amend

Plaintiff has also moved to amend his complaint, primarily to (1) add himself, individually, as a plaintiff, and (2) to assert a claim under Mass. Gen. Laws ch. 93A, for

---

[5] Certainly, by February 1, 2015—that is, three years plus one day before the suit was filed—the investigation was far along, and indeed nearly complete. There is no question that he was on inquiry notice by that date, even if somehow the December 30 IRS statement was not sufficient.

11

intentional or willful conduct.[6]

Under Fed. R. Civ. P. 15, a party may amend its pleading once as a matter of course within 21 days after serving it, or within 21 days after service of a responsive pleading or motion under Fed. R. Civ. P. 12(b), (e), or (f). *See* Fed. R. Civ. P. 15(a)(1). In all other cases, a party may amend a pleading only with consent of the opposing party or leave of the court. *See* Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* "The leave sought should be granted unless the amendment would be futile or reward undue delay." *Abraham v. Woods Hole Oceanographic Inst.*, 553 F.3d 114, 117 (1st Cir. 2009).

However, "[a]s a case progresses, and the issues are joined, the burden on a plaintiff seeking to amend a complaint becomes more exacting." *Steir v. Girl Scouts of the U.S.A.*, 383 F.3d 7, 12 (1st Cir. 2004). "Once a scheduling order is in place, the liberal default rule is replaced by the more demanding 'good cause' standard of Fed. R. Civ. P. 16(b)." *Id.* (citing *O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 154-55 (1st Cir. 2004)). That standard "focuses on the diligence (or lack thereof) of the moving party more than it does on any prejudice to the party-opponent." *Id.* And once the opposing party has moved for summary judgment, "a plaintiff is required to show 'substantial and convincing evidence' to justify a belated attempt to amend a complaint." *Id.* (citing *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994)); s*ee Talbots, Inc. v. Dynasty Int'l, Inc.*, 808 F. Supp. 2d 351, 364 (D. Mass. 2011).

The portion of the motion seeking leave to amend to add Kahveci individually as a plaintiff (as opposed to his professional corporation) is troublesome, but ultimately not dispositive. Khaveci, of course, opened the account and controlled it. And surely counsel should have noticed that the relevant bank account was in his name, not that of the P.C.

---

[6] Kahveci also seeks to (1) to correct typographical errors and (2) reaffirm his demand for a jury trial.

Nonetheless, if that were the only issue, the Court might be inclined to overlook the mistake and permit the amendment.

The proposed addition of a claim under Mass. Gen. Laws ch. 93A is far more problematic. Up until now, plaintiff's claims against the bank have been essentially based on a negligence theory: that the bank both permitted Vaysglus to deposit checks with forged endorsements and failed to monitor activity in the account. He now seeks to add a claim for unfair and deceptive acts and practices in violation of Mass. Gen. Laws ch. 93A. Not coincidentally, claims under Chapter 93A have a four-year limitations period. *See* Mass. Gen. Laws ch. 260, § 5A.

As set forth above, the deadline for motions seeking leave to amend the pleadings to assert new claims was July 20, 2018. That deadline was proposed by the parties, and accepted by the Court without change. The present motion was filed on November 13, 2018, nearly four months after the deadline. The question, therefore, is whether plaintiff has shown "substantial and convincing evidence" for justifying the belated motion. *Steir*, 383 F.3d at 12.

Plaintiff's counsel's explanation for the failure to seek leave to amend is set forth in her affidavit, and is as follows:

> I have performed a considerable amount of legal research with respect to the claims asserted herein, including, inter alia, reviewing numerous recent decisions issued by this and other courts in factually-similar cases. Based upon this research, until just recently, it had been my understanding that Defendant's failure to make any inquiry into Vaysglus'[s] authority to deposit the Insurance Checks into her personal account, or into the authenticity and validity of the endorsements appearing thereon, did not rise to the level of "rascality" required for Plaintiff to prevail on a claim under M.G.L. c. 93A, § 11. . . .
>
> However . . . I have recently conducted a number of interviews of potential expert witnesses for this matter . . . .
>
> During these interviews, each of the potential expert witnesses has independently concluded, and unequivocally expressed to me, that the Defendant's actions (or

> inaction) relative to Vaysglus'[s] embezzlement scheme was not merely atypical, but rather that it was *outrageously abnormal, surprisingly improper*, and that it did not comport, in many respects, with both Defendant's own internal policies, and the larger banking industry's norms.
>
> Having watched multiple, experienced banking professionals literally 'raise their eyebrows,' upon learning of the facts of this case, I now believe Defendant's conduct was sufficiently 'objectionable' for it to be found to have violated M.G.L. c. 93A, §§ 2 and 11, and the Plaintiff should therefore be permitted to amend its Verified Complaint to add a claim thereunder.

(Newman Aff. ¶¶ 24-27) (emphasis added).

Under the circumstances, plaintiff has not shown "substantial and convincing evidence" justifying a belated attempt to amend the complaint, much less established "good cause" under Fed. R. Civ. P. 16(b). *See Steir*, 383 F.3d at 12.

First, plaintiff does not contend that he discovered new facts, or that the claim was inherently unknowable at the time the complaint was filed. Indeed, he points to no information of any kind that he gleaned from the discovery process that could have affected his ability to discover the Chapter 93A claim. There is thus no real reason why the claims could not have been asserted at an earlier time.

Second, the fact that plaintiff's counsel did not consult with an expert on banking practices until long after the litigation had been underway is not a compelling reason to permit amendment. Plaintiff had three years after the accrual of the action in which to consult an expert, and for that matter could have done so during the first five or six months after filing the complaint.

Third, it seems clear that defendant will be prejudiced, both due to undue delay and the need for additional discovery. Plaintiff expressly states that the proposed Chapter 93A claim is not based solely on the bank's "failure to make any inquiry into Vaysglus'[s] authority to deposit the Insurance Checks into her personal account," or "into the authenticity and validity of the

14

endorsements." (Newman Aff. ¶ 24). Instead, he contends that it is based on the claim that the bank's actions were "outrageously abnormal," "surprisingly improper," and "did not comport" with the bank's "own internal policies" and "the larger banking industry's norms." (*Id.* ¶ 26). Notably, he does not identify which bank internal policies, and which banking industry norms, were violated, and whether and how they differ from the obligations imposed by the Uniform Commercial Code.[7] In any event, the bank ought to be entitled to explore, as a factual matter, the factual basis for those claims. But fact discovery closed on October 19, 2018, and would have to be reopened to address the new claim.

In short, plaintiff waited until after defendant had moved for summary judgment to seek to amend the complaint. Having waited until that point, he is required to show "substantial and convincing evidence" justifying his belated attempt to amend. *See Steir*, 383 F.3d at 12. Because he has failed to do so, the motion to amend will be denied.

Of course, the practical consequence of the denial of the motion to amend is that plaintiff's claims against the bank will necessarily fail. It is possible, of course, that those claims have merit. And the Court is certainly sympathetic to the plaintiff's position: he was betrayed by a trusted friend, and lost a considerable amount of money. But it is also true that statutes of limitation cut off even meritorious claims, and injured parties delay filing suit at their peril.

Accordingly, the motion for leave to amend will be denied.

## IV. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is GRANTED, and

---

[7] Count Four of the proposed amended complaint, however, does not identify any such violations of internal policies or banking norms. Instead, it simply reasserts the contentions that the bank failed to exercise reasonable care in permitting the checks to be deposited and failed to make inquiry into the authority of Vaysglus to deposit the checks in her personal account, and alleges that such conduct violates Chapter 93A.

15

plaintiff's motion to amend the complaint is DENIED.

**So Ordered.**

                                                        /s/ F. Dennis Saylor
                                                        F. Dennis Saylor IV

Dated: January 25, 2019                      United States District Judge